## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. ___26-mj-02694-Sanchez___

**IN RE SEALED COMPLAINT**

_____/

**CRIMINAL COVER SHEET**

FILED BY_____ER_____D.C.

**Apr 21, 2026**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?   No

2. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023?  No

3. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024?  No

4. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024?  No

5. Did this matter involve the participation of or consultation with Magistrate Judge Yeney Hernandez during her tenure at the U.S. Attorney's Office, which concluded on April 1, 2026? No

Respectfully Submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: _/s/Jackson K. Dering V_____
    Jackson K. Dering V
    Robert Moore
    Assistant United States Attorneys
    Fl Bar ID: A5503449
    United States Attorney's Office
    99 N.E. 4th Street
    Miami, FL 33132
    (786) 239-9274
    Jackson.Dering@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| **Trenton Richard David Johnston,** | ) | Case No.  26-mj-02694-Sanchez |
| | ) | |
| | ) | |
| | ) | |
| *Defendant.* | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   January 2026 to on or about March 23, 2026   in the county of        Miami-Dade        in the

    Southern     District of      Florida       , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §1349 | Conspiracy to Commit Wire Fraud |
| 18 U.S.C. §1956(h) | Conspiracy to Commit Laundering of Monetary Instruments |

This criminal complaint is based on these facts:

**See attached Affidavit**

☑ Continued on the attached sheet.

_____
*Complainant's signature*

        Ivan Sanchez, Special Agent HSI
        *Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by   Face Time

Date:  April 21, 2026

_____
*Judge's signature*

City and state:        Miami, Florida        Honorable Eduardo I. Sanchez, United States Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Ivan Sanchez, being duly sworn, depose and state the following:

### INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), and have served in this capacity since June 2005. I am assigned to HSI Miami Transnational Financial Crimes Unit and am responsible for conducting and assisting in investigations relating to money laundering, wire fraud, and other federal crimes. I have received specialized training in financial fraud and money laundering investigations and have approximately 19 years of experience in conducting financial investigations. In my capacity as a Special Agent, I have participated in criminal investigations involving complex financial fraud and money laundering.

2.     In my capacity as a United States law enforcement officer, I am empowered by law to conduct investigations and to make arrests for offenses detailed in Title 18, Title 21, and Title 31 of the United States Code.

3.     This Affidavit is made in support of the Criminal Complaint charging **Trenton Richard David Johnston** ("JOHNSTON") with violations of Title 18, United States Code, Section 1349, Conspiracy to Commit Wire Fraud, and Title 18, United States Code, Section 1956(h), Conspiracy to Commit Laundering of Monetary Instruments.

4.     This Affidavit is based on my personal investigation and investigation by others, including federal and local law enforcement officials whom I know to be reliable and trustworthy. The facts and information contained herein have been obtained by interviewing witnesses and examining documents and electronic devices obtained in the course of the investigation as well as

through other means. This Affidavit does not include every fact known to me about this investigation, but rather only those facts sufficient to establish probable cause.

## BACKGROUND ON CRYPTOCURRENCY

5.      **Virtual Currency (or Cryptocurrency):** Virtual currencies are digital tokens of value circulated over the Internet as substitutes for traditional fiat currency. Virtual currencies are not issued by any government or bank like traditional fiat currencies, such as the U.S. dollar, but rather are generated and controlled through computer software. Bitcoin (or "BTC") and Ethereum ("ETH") are currently the most well-known virtual currencies in use.

6.      **Bitcoin:** BTC is a type of virtual currency. Unlike traditional, government controlled currencies (i.e., fiat currencies), such as the U.S. dollar, Bitcoin is not managed or distributed by a centralized bank or entity. Because of that, Bitcoin can be traded without the need for intermediaries. Bitcoin transactions are approved/verified by computers running Bitcoin's software. Those computers are called network nodes. Each node uses cryptography to record every Bitcoin transaction on the Bitcoin blockchain. The Bitcoin blockchain is a public, distributed ledger. Bitcoin can be exchanged for fiat currency, other virtual currencies, products, and services.

7.      **Ethereum:** ETH or Ether is a virtual currency that operates on the Ethereum blockchain, a decentralized ledger. Ethereum transactions are recorded on a public blockchain, allowing users to transfer value using alphanumeric wallet addresses rather than traditional bank accounts.

8.      **Monero (XMR):** XMR or Monero is a virtual currency which uses a blockchain with privacy-enhancing technology to obfuscate transactions to achieve anonymity and fungibility. It is widely regarded as a privacy coin and believed untraceable by law enforcement.

2

9.     **Virtual Currency Address:** Virtual currency addresses are the particular virtual locations to or from which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of letters and numbers.

10.     **Private Key:** Each virtual currency address is controlled through the use of a unique corresponding private key, a cryptographic equivalent of a password, which is needed to access the address. Only the holder(s) of an address's private key can authorize a transfer of virtual currency from that address to another address.

11.     **Virtual Currency Wallet:** There are various types of virtual currency wallets, including software wallets, hardware wallets, paper wallets. These wallets contain software applications that interface with the virtual currency's specific blockchain and generate and store a user's addresses and private keys. A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time.

12.     **Seed Phrase:** is a series of words that serves as a backup for the wallet; it can recreate the wallet's private keys and restore full access to the cryptocurrency. Seed phrases are functionally equivalent to the private key in terms of granting control, which is why both are considered highly sensitive evidence in cryptocurrency-related investigations.

13.     **Blockchain:** The code behind many virtual currencies requires that all transactions involving that virtual currency be publicly recorded on what is known as a blockchain. The blockchain is essentially a distributed public ledger, run by a decentralized network of computers, containing an immutable and historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every

transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies.

14.    **Virtual Currency Exchanges (VCEs):** VCEs are trading and/or storage platforms for virtual currencies, such as BTC, ETH, etc. Many VCEs also store their customers' virtual currency in virtual currency wallets. As previously stated, these wallets can hold multiple virtual currency addresses associated with a user on a VCE's network. Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (i.e., Know Your Customer (or KYC) checks) and to have anti-money laundering programs in place (to the extent they operate and service customers in the United States).

15.    **Alienware Laptops:** are computers that possess advanced processing, storage, and networking capabilities that can be used to facilitate schemes involving wire fraud. These systems can access the internet through wired or wireless connections, enabling the transmission of electronic communications, fraudulent representations, and financial transactions across state and international boundaries. Their substantial storage capacity allows users to maintain digital records, such as victim information, account credentials, templates for fraudulent communications, and logs of online activity. Additionally, Alienware laptops support encryption tools, anonymization software, virtual private networks, and applications that enable the creation, modification, or concealment of digital evidence. Due to these capabilities, such a device may contain data evidencing the execution, planning, or coordination of wire based fraudulent schemes.

16.    **Discord:** is a versatile communication app that lets users chat via text, voice, and video in organized groups called servers.

17.    **Telegram:** is a cloud-based messaging app that lets users send texts, make voice and video calls, and share large files quickly across devices.

## OVERVIEW

18.     Trenton JOHNSTON is a 19-year old citizen of Canada who entered the United States at the Buffalo land border port of entry on October 3, 2024, and was admitted as visitor for pleasure for no more than 12 months. JOHNSTON has never been granted authorization to work in the United States nor authorization to stay beyond the 12 month period.

19.     Law enforcement has been investigating Trenton JOHNSTON and co-conspirators for a scheme, from at least as early as February 2026, continuing to on or about March 23, 2026, to steal cryptocurrency from victims that works in the following manner: (a) contacting victims falsely and fraudulently posing as technical support from Google and cryptocurrency-related companies; (b) causing victims to provide access to their cryptocurrency wallets; (c) transferring cryptocurrency from the victims' wallets to wallets under the control of the co-conspirators; and (d) spending the funds on luxury items, including short-term house rentals, exotic car rentals, jewelry, vehicles such as a Lamborghini and other items. JOHNSTON and his co-conspirators have been involved in cryptocurrency thefts exceeding approximately $13 million.

20.     This investigation began when Confidential Source #1 (CS1) presented law enforcement with text messages between him/her and JOHNSTON. These text messages revealed that JOHNSTON was making millions of dollars by defrauding victims. CS1 informed law enforcement that JOHNSTON would defraud victims by stealing cryptocurrency. CS1 stated that he/she had witnessed JOHNSTON using an Alienware computer with cryptocurrency account information on the screen. CS1 observed JOHNSTON engaging in cryptocurrency fraud while JOHNSTON was in his/her presence.

21.     On March 24, 2026, law enforcement conducted a traffic stop of a white Rolls Royce in North Miami, Florida occupied by JOHNSTON and other individuals.  Law enforcement

5

interviewed these individuals:  confidential witness #1 (CW1), confidential witness #2 (CW2), and confidential witnesses #3 (CW3).

22.     CW1 stated that he/she initially met JOHNSTON online. CW1 confirmed that he/she was unemployed and did not pay his/her own expenses. CW1 relied on his/her mother's credit card or JOHNSTON for financial support. CW1 had been living with JOHNSTON for approximately one year in three different houses. CW1 confirmed that JOHNSTON paid for his/her housing, food, club outings, and car rentals. CW1 also confirmed that JOHNSTON did not have any lawful employment and financed their activities primarily through cryptocurrency obtained via social engineering and theft. CW1 stated that JOHNSTON would screenshare his cryptocurrency thefts through an online platform called Discord. CW1 stated that JOHNSTON would use a gaming computer to engage in cryptocurrency thefts.

23.     CW1 stated that he/she witnessed JOHNSTON impersonating entities like Google in speaking with victims to gain access to victims' accounts. CW1 stated that he/she attempted similar cryptocurrency thefts after receiving directions from JOHNSTON but did not successfully steal funds. CW1 estimated JOHNSTON's proceeds from stolen cryptocurrency to be in the millions of dollars.

24.     CW2 stated that he/she initially met JOHNSTON through a relative and has known him since around December 2024. CW2 has been living with JOHNSTON for approximately one year. CW2 stated he/she sometimes received money from JOHNSTON. CW2 confirmed that JOHNSTON does not have any lawful employment and lived off stolen funds that JOHNSTON spent on clubs, cars, clothes, and other expenses. CW2 stated that he/she witnessed JOHNSTON stealing victims' cryptocurrency. CW2 observed JOHNSTON use an Alienware computer to communicate with victims and impersonate entities like Google and crypto exchanges to gain

6

access to victims' accounts. CW2 stated that JOHNSTON stored screenshots on the Alienware computer. CW2 also told law enforcement that JOHNSTON stored screenshots of his fraudulent activities on his cellphone as well as his Telegram phone application. CW2 estimated that JOHNSTON's proceeds from stolen cryptocurrency to be in the millions of dollars. CW2 stated that he/she participated in these fraudulent activities, and after learning from JOHNSTON, had successfully stolen victims' cryptocurrency.

25.     CW3 stated that he/she initially met JOHNSTON through a mutual friend and had known him for approximately one year. CW3 had been traveling and living with JOHNSTON in various rented accommodations. CW3 confirmed that he/she was unemployed and relied on JOHNSTON for financial support.

26.     CW3 stated that he/she participated with JOHNSTON in social engineering scams targeting victims and stealing their funds. CW3 stated that victim information was obtained from leaked database data. CW3 stated the process involved the hacking of victims' Gmail accounts by impersonating Google employees. The accounts are then searched for any crypto-related information. CW3 explained that victims are then contacted by phone or computer posing as cryptocurrency exchange support representatives and were directed to enter their wallet seed phrases into a fraudulent website. CW3 estimated that he/she personally stole approximately $20,000 and that JOHNSTON's proceeds to be in the tens of millions of dollars based on their conversations and his/her own observations. JOHNSTON used these funds to pay for housing and club outings. These payments were made using cryptocurrency through various contacts.

### Search of JOHNSTON's Property

27.     On March 24, 2026, law enforcement lawfully seized JOHNSTON's Alienware computer (the "Computer") and cellphone (the "Cellphone") (collectively, "TARGET

DEVICES"), and handwritten notes containing seeds phrases for various cryptocurrency wallets in JOHNSTON's belongings. Law enforcement seized these items after JOHNSTON was arrested in Miami-Dade county on state charges for possession of a controlled substance following the traffic stop identified above.

28.     On April 3, 2026, the Honorable Judge Edwin G. Torres authorized a search of the TARGET DEVICES pursuant to a search warrant.

## Victim 1

29.     Law enforcement reviewed the handwritten notes in JOHNSTON's possession and found seed phrases for various cryptocurrency wallets. For example, law enforcement identified an Ethereum (ETH) wallet address beginning with "0x96aeefd." A blockchain analysis linked the wallet to proceeds of a cryptocurrency theft involving Victim 1. Victim 1 is a resident of California.

30.     Law enforcement interviewed Victim 1 who described the manner of the cryptocurrency theft. Victim 1 stated that his/her Google email and Coinbase accounts were compromised and that the funds in his/her account were stolen. Victim 1 reported receiving telephone calls from individuals identifying themselves as support representatives for Google and Coinbase. Victim 1 believed these callers to be the actual company representatives. Victim 1 logged into his/her account and noticed the funds had been transferred. Victim 1 confirmed that none of the funds have been returned to him/her.

31.     In total, Victim 1 was the victim of cryptocurrency theft of approximately 21 ETH, valued at approximately $41,000 on or about February 20, 2026. On the same date, the stolen cryptocurrency was transferred through a series of transactions to five different wallets. The seed phrases in JOHNSTON's possession correspond to one of these wallets that received funds from Victim 1 on the date of the theft.

8

## Victim 2

32.     On March 14, 2026, Victim 2, a resident of California, filed a police report in California for a cryptocurrency theft that occurred the day prior.

33.     Victim 2 reported he/she received a phone call from a number displaying the caller ID "Google." The subject(s) posed as a Google representative and falsely alerted him/her that someone was trying to change his/her email password and had sent Google a photo of his/her driver's license as verification. Victim 2 confirmed that the email account showed signs of compromise, including an outgoing email to "Trezor" requesting the cancellation of his/her account, which he/she did not send. Trezor is a cryptocurrency company that provides cold wallet storage disconnected from the Internet.

34.     Shortly after ending the first call, Victim 2 received a second call with the subject(s) falsely identifying themselves as Trezor representatives. The subject(s) claimed that someone was attempting to access Victim 2 cryptocurrency accounts.

35.     The subject(s) instructed Victim 2 not to connect his devices to his computer and instead sent a link via text message directing him to enter his private keys. Believing the call to be legitimate, Victim 2 entered the private keys for his/her Trezor wallet, and for another cold storage wallet. After providing the private keys, Victim 2 checked his/her wallets and discovered that balances in both wallets had been depleted to zero. Victim 2 advised that approximately 185 BTC were stolen from his/her wallets, or the equivalent of approximately $13 million. To date, none of these assets have been recovered.

### Communications between JOHNSTON and Co-Conspirator 1

36.     In the search of the Cellphone, law enforcement identified several messages between JOHNSTON and an unidentified co-conspirator ("Co-conspirator 1"). These messages

9

were located in an encrypted messaging app called Signal. JOHNSTON and Co-conspirator 1 made multiple references to having successfully "hit," "smacked," or otherwise obtained 185 BTC, from a victim, which they refer to as "target" or "targ." The conversation began on March 13, 2026, as reflected in the forensic extraction of the device. Messages from JOHNSTON and Co-conspirator 1 revealed conversations about the theft of Victim 2's cryptocurrency.

37.     On March 13, 2026, JOHNSTON sent two messages to Co-conspirator 1; "yo" and "wya," a common slang acronym for "Where you at?".

38.     Co-conspirator 1 sent three messages, "yo," "like" and "coral gables kinda."

39.     JOHNSTON sent the following messages to Co-conspirator 1; "I am on a three day 6fig streak," and "7 is coming soon."

40.     On March 14, 2026, JOHNSTON sent a series of messages to Co-conspirator 1; "we just," "did shit n*****s haven't been able to do," "since prime tree," and "Trezor."

41.     Co-conspirator 1 sent a series of messages to JOHNSTON; "we so goated," "bro," "185 btc," "lol," "f*ck that," "felt so good," "and that was, "so f*cking," "motivating." Goating is a common slang for being the "Greatest Of All Time."

42.     Co-conspirator 1 sent messages to JOHNSTON stating; "we need to hit," "another big," and "one."

43.     JOHNSTON sent a message to Co-conspirator 1; "Bro we rlly actually did some crazy ass shit lol."

44.     Co-conspirator 1 responded; "we were always," "destined to be 8figure n****s," "ngl." Ngl is a common slang for "not gonna lie."

10

45.     Co-conspirator 1 sent the following messages to JOHNSON; "I'm not spending a dollar from my cut," "I have 500k I alr had," "Putting it in xmr" and "living off that." Monero ("XMR") is a blockchain-based cryptocurrency known for being private and untraceable.

46.     Co-conspirator 1 sent a series of messages to JOHNSTON, including; "185 btc," and "F****ing unheard of bro."

47.     JOHNSTON responded to Co-conspirator 1's messages; "Club feels mad good" and "After today." Additionally, JOHNSTON replied to the "185 btc" message with; "Dead ass un seen."

48.     JOHNSTON sent a series messages to Co-conspirator 1; "185 btc tho", "easily n***a" and "And we ain't done."

49.     Co-conspirator 1 responded to JOHNSTON's message with; "Bro," "185," and "Is such a whale number."

50.     JOHNSTON responded to Co-conspirator 1's messages with; "We actually smacked a 185btc target today;" followed by; "Like unironically smacked a 185."

51.     On March 16, 2026, JOHNSTON sent two messages to Co-conspirator 1's; "I'll lyk I'm chilling tn so I can get on early tmr morning;" followed by, "And rape n****s for lots of btc."

52.     From my training and experience, JOHNSTON and Co-conspirator 1 were discussing the theft of 185 Bitcoin from Victim 2, worth approximately $13,100,000.

53.     Analysis of blockchain activity confirmed that a series of transactions occurred following the initial cryptocurrency theft. Based on my training and experience, I understand that these subsequent transfers, which involved other cryptocurrencies and numerous wallets, were intended to obscure and conceal the true nature, location, ownership, or control of the property.

11

### JOHNSTON'S Cryptocurrency Spending

54.     In the continued search of JOHNSTON's cellphone, between January 2026 and March 2026, the investigation revealed JOHNSTON communicated with an individual hereinafter referred to as Co-conspirator 2 . During this time, Co-conspirator 2 assisted JOHNSTON and other conspirators in obtaining luxury vehicles and short-term home rentals in Los Angeles, California, and Miami, Florida.

***Communications between JOHNSTON and Co-Conspirator 2***

55.     In January 2026, JOHNSTON purchased a BMW M5 G90 through Co-conspirator 2, and requested he have it delivered to California and titled under Co-conspirator 2. In the messages, Co-conspirator 2 told JOHNSTON that the vehicle would be registered under his company name. According to chat messages, a downpayment for the vehicle was made by JOHNSTON in January 2026 and subsequently paid of the remaining balance in March 2026 using cryptocurrency. Blockchain analysis confirmed that the transactions were completed and recorded on the blockchain. Co-conspirator 2 asked JOHNSTON if he was interested in renting out the vehicle when not in use. JOHNSTON responded that he would consider it if he could earn legal income deposited into a bank account under his name, but noted that he was an illegal alien. Co-conspirator 2 recommended that JOHNSTON open an LLC and use it to establish a bank account. Co-conspirator 2 then stated, "Igu" (a common slang term meaning "I got you") and suggested they discuss the matter in person.

56.     In January 2026, JOHNSTON requested Co-conspirator 2 to arrange a private jet from Miami, Florida to Los Angeles, California for himself and two additional travelers. On January 21, 2026, JOHNSTON messaged Co-conspirator 2 stating that he had sent $45,000 in

12

cryptocurrency to cover the cost of the private jet and an outstanding balance for exotic car rentals. Blockchain analysis confirmed that the transaction was completed and recorded on the blockchain.

57. On January 24, 2026, JOHNSTON asked Co-conspirator 2 if he could provide $10,000 in cash. Co-conspirator 2 confirmed that he could and requested that JOHNSTON send $11,000 in cryptocurrency using ETH. On January 25, 2026, Co-conspirator 2 provided a wallet address and JOHNSTON confirmed payment was made. Blockchain analysis confirmed that the transaction was completed and recorded on the blockchain.

58. On February 10, 2026, JOHNSTON sent a series of messages, including, "Cause if I can make legal bread into a bank acc," and "I'll buy cars."

59. JOHNSTON and Co-conspirator 2 discussed legal issues concerning an individual named "Nick." JOHNSTON stated that Nick was currently on house arrest for RICO charges. JOHNSTON explained that associates cooperated with authorities and added that an individual named "Hamza" had "snitched on all of us." JOHNSTON claimed that there is no evidence directly linking them to wrongdoing due to the use of anonymous cryptocurrency transactions and the fact that their names were never used. JOHNSTON stated that he paid Nick's attorneys $150,000, and that the payment was made through a business owned by another individual in order to provide proof of funds. JOHNSTON wrote; "Cause when it's as deep as the case is these n****s legit look into every single detail."

60. On February 28, 2026, Co-conspirator 2 sent a series of messages to JOHNSTON offering a house in Miami that was available for rent through a close friend. Co-conspirator 2 explained that he could secure the house and that no documents would be in JOHNSTON's name, and that his contact would not require JOHNSTON to sign anything. JOHNSTON agreed to rent the house for $40,000 plus a $10,000 deposit, for a one-month period. JOHNSTON asked Co-

conspirator 2 to provide an ETH wallet address for payment. After receiving the wallet address, JOHNSTON sent the funds. Law enforcement agents interviewed the real estate broker involved in the rental transaction and confirmed that a wire transfer in the amount of $50,000 was received on March 3, 2026, from Co-conspirator 2 for the property. Blockchain analysis confirmed that the transaction was completed and recorded on the blockchain. A review of JOHNSTON's phone revealed videos depicting JOHNSTON at the residence.

61.     On March 5, 2026, Co-conspirator 2 inquired about a pending balance owed by JOHNSTON. JOHNSTON responded; "Yeah he's doing it he's running thru like 40 Xmr wallets tho" and "So it's good."

62.     On March 15, 2026, a few days after the cryptocurrency theft of Victim 2, JOHNSTON and Co-conspirator 2 negotiated the sale of a BMW M4 to JOHNSTON. Co-conspirator 2 offered to keep the vehicle titled and insured under his company name. JOHNSTON agreed to the purchase and sent $72,000 in cryptocurrency as full payment. Blockchain chain analysis confirmed that the transaction was completed and recorded on the blockchain.

63.     On the same day, JOHNSTON and Co-conspirator 2 discussed the possibility of investing in a car rental business together. Co-conspirator 2 stated that an investment of $500,000 to $750,000 was needed. JOHNSTON responded that this would be easy if he could obtain United States citizenship.  JOHNSTON added that his cousin in Canada holds all of his money so that he doesn't spend it.

64.     JOHNSTON wrote; "*I legit have a trafficking ring bro my cousin holds all my money then when I need shit he sends to my boy in nyc*" and "*he cleans it for Me.*" (emphasis added).  Co-conspirator 2 subsequently replied; "I'll have to see how I can work it…theres a lot of risk for me yk." (YK is common slang for "you know").

14

65.     On March 21, 2026, Co-conspirator 2 requested that JOHNSTON settle an outstanding balance owed for the purchase of a Lamborghini and jewelry totaling $623,000. JOHNSTON responded that it was acceptable and stated that his friend from Dubai could complete the KYC, adding; "It's gonna be cleaned" and "And sent to you." JOHNSTON then sent a message "Cleaning the money now," followed by; "ETH is being prepared."

66.     Co-conspirator 2 sent a message inquiring when the funds would be sent and asked; "Its gnna be clean right."

67.     JOHNSTON responded with a series of messages, "Yes," "ETA 2-3hours," "He's running it thru Monero to clean it tn" and "Rn." (Rn is common slang for "Right Now").

68.     On March 22, 2026, JOHNSTON stated that he was only able to get $550,000 from his friend and would pay the remaining balance after his friend sent the rest. JOHNSTON asked Co-conspirator 2 to provide an ETC wallet address for payment. After receiving the wallet address, JOHNSTON sent the funds, and Co-conspirator 2 confirmed receipt. Blockchain chain analysis confirmed that the transaction was completed and recorded on the blockchain.

69.     Based on the foregoing, JOHNSTON conspired with CW1, CW2, CW3, Co-conspirator 1, and other unidentified conspirators to commit wire fraud by causing the transfer of victims' cryptocurrency assets from outside the State of Florida into the State of Florida. JOHNSTON conspired with Co-conspirator 2 and other unidentified conspirators to conceal the nature, location, source, and ownership of the proceeds by running it through cryptocurrency wallets to make it untraceable.

## CONCLUSION

70.     I submit that probable cause exists to believe that in the Southern District of Florida:

15

- From in or around, January 2026, through in or around March 2026, the defendant, Trenton JOHNSTON, did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with others, to knowingly, and with intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representations and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing such scheme and artifice to defraud, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, an sounds, in violation of Title 18, United States Code, Section 1343, all in violation of Title 18, United States Code, Section 1349.

- From in or around, January 2026, through in or around March 2026, the defendant, Trenton JOHNSTON, did knowingly and voluntarily combine, conspire, confederate and agree with others, to knowingly conduct a financial transaction affecting interstate and foreign commerce which transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), all in violation of Title 18, United States Code, Section 1956(h).

FURTEHR AFFIAN SAYETH NAUGHT.

IVAN SANCHEZ
SPECIAL AGENT
HOMELAND SECURITY INVESTIGATIONS

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1
by Face Time this  21st  day of April 2026.

HONORABLE EDUARDO I. SANCHEZ
UNITED STATES MAGISTRATE JUDGE

16